Petition of **BOAT DEMAND, Inc.,** as Owner of **THE Fishing Vessel DEMAND** for exoneration from or Limitation of Liability.

No. 57-28.

United States District Court
D. Massachusetts.
April 7, 1958.

Joseph F. Dolan, William T. Conlan and Ely, Bartlett & Brown, Boston, Mass., for petitioner.

Seymour P. Edgerton, Bingham, Dana & Gould, Boston, Mass., for Harbor Oil Co., Inc.

Robert K. Lamere, Boston, Mass., for Trawler Oil Corp.

Samuel A. Wilkinson, Boston, Mass., for Boston Fish Market Corp.

ALDRICH, District Judge.

This is a petition for limitation of liability under 46 U.S.C.A. § 183 et seq. The petitioning corporation is the owner of the Demand, a fishing vessel 90 feet long, of some 135 gross tons. She was diesel-powered and, except for a small quantity in a safe place on deck, kept no gasoline on board. I find that in all respects, with the exception about to be referred to, she was tight, staunch, safe and seaworthy, and remained so at all

834

material times until February 3, 1957, when she blew up.

About the first of November, 1956 the Demand was brought to the Boston Fish Pier and tied up for the winter, for the purpose of conversion from pogy fishing to dragging. One Bucci, the president and a principal stockholder of petitioner, was in active charge. He had had 30 years experience on boats of various kinds, and had owned seven. Since 1942 he had been a commercial fisherman, occupying positions as deckhand, chief engineer, and captain. So far as petitioner was concerned, he was its responsible representative in all matters pertinent to this case.

In November and December a worker lived aboard ship, and maintained a fire in the galley for heating and other purposes. Just before Christmas he left, and in order to keep the vessel warm, Bucci had installed a propane (liquified petroleum) gas space heater. The installation was made by Metropolitan Ice Company. The heater was placed in the engine room, not far from an automatic electric bilge pump, and was connected by a copper tubing to two gas "bottles" permanently installed on the deck. It had a continuously burning pilot, with a so-called 100% safety shut-off. Propane gas is heavier than air, and, mixed with air, is explosive. The burner was not of the completely sealed type, viz., combustion air was drawn from the surrounding atmosphere, through a grid or passageway, instead of being piped in from outside. Any gas leaking inside the heater could escape into the engine room through this passageway to some external source of ignition, such as the electric pump. Conversely, if external leaking gas were to form an explosive mixture outside the heater, it would have access to the pilot through this same passageway.

Shortly before Saturday, January 27, 1957, Bucci was injured in an automobile accident, and was advised by his doctor to stay home for two weeks. On January 27 or 28 he was notified by an associate that the burner was out. As a re-sult of this he drove from Methuen to the Fish Pier. On going below he found the pilot flame extinguished. Petitioner suggests that this may not have been involuntary. I find otherwise, or Bucci, recently injured, would not have made such a trip. He found the atmosphere in the engine room "stuffy and musty," and aired everything out before relighting the burner. On the evening of February 2, 1957, he again visited the vessel. This time the heater was apparently running normally. Before leaving he checked the engine room hatchway, found it secure, closed the door between the engine room and the crew's quarters, and left the vessel entirely locked up. The only access of air to the engine room was through a stack in the deck. This aperture was sizable, but somewhat obstructed by baffles, and afforded poor ventilation, particularly around the floor and bilges where any leaking gas would accumulate, when the boat was tied to a pier and locked up. At noon on February 3, while no one was aboard, there was a violent explosion and fire. The force of the explosion broke nearly every window in an adjacent building 70 feet high, ripped out, and moved some 40 feet, heavy superstructure on the pier, and damaged claimants' vessels. The Demand sank, and is alleged by petitioner to be a total loss. She has not been raised.

Claimants introduced into evidence certain sections of a pamphlet entitled "Fire Protection Standards for Motor Craft," issued by the National Fire Protection Association. The membership of this association is impressive, and I find that the pamphlet fully complies with Mass.Gen.Laws Ch. 233, § 79B. Petitioner objected to its admission on two grounds: (1) That the Demand was "out of commission;" and (2) that, along with much of the rest of claimant's case, the evidence was irrelevant, because the court could not find that the loss of the vessel was due to any particular part of its equipment.

The exact status of the vessel is of some importance. Paradoxically, at the same time petitioner claimed her to

be out of commission, it was claiming that she was "engaged in the fisheries," so as not to be subject to Coast Guard inspection under 46 U.S.C.A. § 170. Section 170(6) (b) (iii). In view of the fact that the vessel was afloat in navigable waters, tied up only for the purpose of conversion of certain gear and machinery, and being regularly boarded and occupied, I hold she was not exempt from the usual standards of care appropriate to vessels. It is less clear that she was not "engaged in the fisheries." It does not seem to me too reasonable to say that a vessel converting for one type of fishing from another should become subject to Coast Guard regulation simply during this interim. Suppose the conversion took only a few days, instead of a few months? It is of some significance that the word is "fisheries," rather than "fishing." This is a criminal statute, and must be strictly construed. United States v. Resnick, 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127. I hold that 46 U.S.C.A. § 170 was not violated.

Returning to "Fire Protection Standards," Part II, Ch. 3, Fuel System, relied on by claimants, is inapplicable to this installation. That section relates to the engine, not heater, fuel lines. However, the following provisions were relevant and not followed: a) Cylinder and supply valves to be shut when boat unattended. § 421(h) (1). This is so important that a notice to this effect is to be posted by the installation. § 421(i). b) No continuous-burning pilot flame. § 428(c) (1); § 432(a) (3). c) Only fully sealed combustion chamber drawing combustion air from outside the hull. § 426(d). There were others, but I do not pause to consider them. Oral testimony from one Stone, a qualified expert, corroborated and developed each of these three points, and the reasons behind

them, to my satisfaction. In substance, the reasons are that if a leak develops, the chances of the gas becoming ignited are much greater if any of these precautions have not been observed.

■ Petitioner's chief attempt to meet this evidence was by testimony concerning the engine room ventilator. I found this unpersuasive, particularly in view of the fact that the vessel was tied up, with her hatches, and other normal means of access and circulation of air, fully secured.[1] I find that the installation of this propane heater made the vessel unseaworthy for normal operations, and even more dangerous, unless fully shut off, when she was secured and unattended.

Under these circumstances I find that the most probable cause, or contributing cause, of the casualty was the presence and operation of the unsafe heater. Petitioner suggests that the explosion may have been due to some external cause, such as vandalism. If there were no logical, persuasive reason to ascribe the occurrence to something within the vessel, I might have to consider seriously this possibility, remote and unlikely as it seems. But having reached the conclusion that leaving this heater in operation was dangerous, and a casualty having resulted of just the nature that could be apprehended, I find that claimants have satisfied their burden of proof. I agree it is not possible, but I hold it is not necessary, to determine just what went wrong, or exactly how it happened.

■■ The final question relates to privity. Here the burden is upon petitioner. In this respect petitioner stands or falls with Bucci. The installation of this heater, as already stated, was done by Metropolitan Ice Co. Petitioner says that this was effective insulation. If the

---

1. Petitioner suggested that Stone's testimony would mean that such heaters should not be used ashore in a private home. The difference between a house and a boat scarcely needs to be labored. Examination of the above and many other provisions of "Fire Protection Standards for Motor Craft," and the list of

signatories, makes this obvious. Petition further submitted evidence that propane gas is commonly used on fishing and other vessels. I so find. But it did not offer to show that it was commonly, or, indeed, ever, used in a closed-up vessel, or without observing the precautions specified in "Fire Protection Standards."

sole cause of the accident might have been faulty mechanical installation, I might agree. For example, based on expert testimony, I find that the supply line was inadequately fastened for use on a boat that moves, "works," jars against the dock, and vibrates when its machinery is run. But I do not, and do not need to, determine whether Bucci had a right to rely on Metropolitan in this matter. One of the principal improprieties here was the presence of a source of ignition —the unsealed chamber open to the engine room, and the continuous-burning pilot, that would convert a mere passive leak, if there was a mechanical fault somewhere, into an active force. The real negligence was using this type of heater at all. It is not simply a question of who is to blame for leakage of gas, any more than it would be a defense to one who failed to provide a required fire-extinguisher that he had not started the fire.

Petitioner says that even as to the use of the heater it is allowed to rely upon Metropolitan's advice. In view of the fact that the dangerous characteristics of this heater, the open passageway to the engine room atmosphere, and the continuous pilot, were obvious, involving no scientific expertise or hidden knowledge, I doubt the prophylactic effect of Metropolitan's advice, if it gave any advice, other than that it was a good heater, which would operate unattended. Even if it had, or said it had, marine experience, as to which I recall no evidence, a seaman with half of Bucci's experience should have known better than to rely. The blowing up of boats is not an uncommon event. Bucci could not close his eyes to elementary facts just because a vendor, doubtless anxious to make a sale, sold him an installation. Actually, however, I do not think his eyes were closed. I attach some significance to the fact that when on cross-examination he was first asked if the heater had a continuous-operating pilot, he replied he was not sure—he had never looked. I do not believe that. I also note his testimony that the night before the accident he looked into the heater twice to check its operation. This showed a considerable concern. The incident of airing out the boat has already been referred to. I do not think this was for aesthetic reasons, but was a recognition of inadequate ventilation. In sum, I believe Bucci knew enough to know that leaving this heater unattended involved risk. Naturally, with his interest in the vessel, I assume he did not think the risk was very great. It is also true that a vessel does not have to be perfect in order to be seaworthy. But where it is so imperfect as to be unseaworthy, the owner cannot deny or avoid privity by shifting the burden to an independent contractor if he has enough knowledge to appreciate the questionableness of such reliance. In such event, even if he does not have full knowledge, he is not without "notice." Cf. Coryell v. Phipps, 317 U.S. 406, 412, 63 S.Ct. 291, 87 L.Ed. 363. I find that Bucci had at least notice. Limitation will be denied, as well as exoneration.